**IN THE UNITED STATES DISTRTICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |
|---|---|
| JANE DOE,[1] | |
| *Plaintiff*, | |
| | Civil Case No. _____ |
| v. | |
| A360 MEDIA LLC, | JURY TRIAL DEMANDED |
| *Defendant*. | |

## <u>COMPLAINT</u>

1.      Defendant A360 Media LLC ("A360") owns and operates *Us Weekly*, one of the world's most popular sources of celebrity gossip.  On July 7, 2022, *Us Weekly* published a pair of articles about the mother of controversial, celebrity business mogul Elon Musk's twins.  The stories were posted on *Us Weekly*'s website and a link to one of them was published on *Us Weekly*'s Instagram account using Instagram's "Stories" feature.  Within a day, the articles and Instagram story (collectively "the Publications") had been viewed by millions of people.

---

[1] Contemporaneously with the filing of this Complaint, Doe has moved for leave to proceed pseudonymously in light of the substantial, stigmatizing, and irreparable harm that would result from having to file this complaint using her real name.

2.      The Publications included a photo—purportedly of Shivon Zilis, who, the Publications claimed, was the mother of Musk's recently born twins.  The photo appeared atop both articles and was the banner for the Instagram story—meaning it was prominently displayed to everyone who viewed that story.  But there was a problem: The woman in the photo was not Zilis; it was Plaintiff Jane Doe, a married woman who has never even met Musk, let alone had children with him.

3.      Before publishing the articles and Instagram story, *US Weekly*'s staff and editors had reviewed actual photos of Zilis, including on her Twitter feed and in the numerous other publicly available reports about Zilis.  *Us Weekly*'s staff and editors thus knew the photo in the Publications did not depict Zilis, but they either knowingly disregarded the dissimilarity or recklessly published Doe's photo instead, all in a rush to capitalize on the frenzy of public interest in Musk's twins and their mother.

4.      Following the incident, Doe overheard complete strangers gossiping about her reported connection to Elon Musk.  Her husband was teased for marrying "Elon's ex."  Friends and acquaintances reached out to ask about the images.  And Doe was forced to live in constant fear of the stigma and embarrassment from her unmerited association with a story that falsely portrayed her as having cheated on her husband.  What's more, because many other websites immediately picked up the

*Us Weekly* Publications, including the image of Doe—which was entirely foreseeable to A360—Doe's unwanted association with Musk and his twins is potentially part of the internet for all time.

5.      *Us Weekly* eventually acknowledged the error in the Publications but did nothing more than belatedly edit its versions of the Publications to swap out Doe's picture for a picture of Zilis.   *Us Weekly*'s bare acknowledgment of wrongdoing is cold comfort to Doe, who has suffered significant reputational, psychological, and economic injury because of *Us Weekly*'s failure to act on information its staff and editors knew about well before they transmitted the Publications to *Us Weekly*'s global audience.  Even if Doe may never fully recover from those injuries, she brings this action to recover for at least some of what *Us Weekly*'s patently false reports cost her.

## **PARTIES**

6.      Plaintiff Jane Doe is a citizen, resident, and domiciliary of New York. She is married with one young child and a second due later this year.

7.      Defendant A360 Media LLC, which owns and operates *Us Weekly*, is a citizen of Delaware and Georgia.  A360 is a Delaware limited liability company with its principal place of business in Smyrna, Georgia.  Its sole member is a holding company—A360 Media Holdings, LLC—organized as a limited liability company

under the laws of Delaware.  That holding company's sole member is another holding company—Accelerate360 Holdings, LLC—also organized as a limited liability company under the laws of Delaware.  That holding company's sole member is yet another holding company—Accelerate360 Intermediate Holdco, LLC—organized as a limited liability company under the laws of Delaware.  And that holding company's sole member is Worldwide Media Services Group, Inc., a Delaware corporation with its principal place of business in Georgia.  References to "*Us Weekly*" herein include reference to Defendant A360, as publisher of *Us Weekly*.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this civil action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.      This Court has general and specific personal jurisdiction over Defendant A360 under Georgia law and the Due Process Clause of the U.S. Constitution because it is a citizen and domiciliary of the State of Georgia.

10.     Venue is proper in this District under 28 U.S.C. § 1391(b) because A360 maintains its principal place of business in this judicial district, is subject to personal jurisdiction in this district, and therefore resides in this judicial district.

## FACTUAL ALLEGATIONS

**In July 2022, the Birth of Elon Musk's Twins
Becomes a Major Tabloid Story**

11.    In November 2021, Elon Musk had twins with Shivon Zilis, an executive at his Neuralink company.  Just weeks earlier, however, Musk had welcomed a child with his longtime girlfriend, the musician Grimes.

12.    The twins' existences were kept secret until early July 2022, likely to avoid the explosion of unfavorable coverage that would inevitably occur if tabloids picked up on the proximity of the twins' births and the birth of Musk's child with Grimes.

13.    In July 2022, however, media outlets discovered that Musk was the twins' father and learned of the timing of their births.  That news led to a tabloid feeding frenzy, as well as widespread public gossip and speculation about the twins, Zilis, and her relationship with Musk.

14.     On July 6, 2022, a raft of prominent celebrity-gossip outlets—including *People*,[2] *TMZ*,[3] and *Page Six*[4]—published stories about Zilis and the twins she had with Musk.  Each of those stories featured photos of Zilis.

15.     Early the next day, Musk indirectly confirmed the reporting about the twins' births by tweeting, "Doing my best to help the underpopulation crisis."  Musk has more than 100 million followers on Twitter and his July 7, 2022 tweet fueled the broader public's interest in the twins.  Indeed, the tweet currently has approximately 23,600 retweets, 17,400 quote tweets, 257,700 likes, and 2,400 bookmarks.

16.     Musk's tweet exacerbated the pressure on *Us Weekly* to publish stories about the twins and their mother.  The pressure was especially acute because so many of *Us Weekly*'s competitors in the celebrity-gossip business had published their own stories about the twins and Zilis a day earlier.

---

[2] Charmaine Patterson, *Elon Musk Had Twins Last Year with Exec Shivon Zilis Just Weeks Before His & Grimes' Baby Was Born*, People (July 6, 2022), https://people.com/parents/elon-musk-had-twins-last-year-with-exec-shivon-zilis.

[3] *Elon Musk HAD TWINS WITH ONE OF HIS EXECS…According to New Report*, TMZ (July 6, 2022), https://www.tmz.com/2022/07/06/elon-musk-secretly-fathered-twins-neuralink-executive.

[4] Evan Real, *Elon Musk Welcomed Twins with Top Exec Just Before 2nd Child with Grimes Was Born: Report*, Page Six (July 6, 2022), https://pagesix.com/2022/07/06/elon-musk-welcomed-twins-with-shivon-zilis-last-year-report.

17.    And so *Us Weekly* hurriedly published two articles about the intrigue surrounding the twins' births.  Both articles were authored by Miranda Siwak, an *Us Weekly* writer working in New York.

18.    One of the articles was titled *Who Is Shivon Zilis?  5 Things to Know About the Neuralink Executive Who Welcomed Twins with Elon Musk*.  The other article was titled *Elon Musk Quietly Welcomed Twins with Neuralink Executive Weeks Before Daughter With Grimes Was Born*.  A360 published both of the articles on *Us Weekly*'s website, which receives tens of millions of visits every month.  A360 also promoted at least one of the articles in a story on *Us Weekly*'s Instagram account, which had well over four million followers at the time.

19.    The Publications (both articles and the Instagram story) prominently featured the same image of a woman—purportedly Zilis—holding a mug while standing in front of what appears to be a kitchen window.  The photo appeared at the top of both articles and it was the banner image on the Instagram story, meaning everyone who viewed the story was shown the photo along with a caption indicating that the woman featured in the photo was the mother of Musk's twins.  But there was a problem:  The woman in the image was not Zilis; it was Plaintiff Jane Doe, who had briefly been Zilis's roommate almost a decade earlier but was otherwise entirely unconnected to the story.

20.     *Us Weekly **knew*** the photo atop its Publications was not a photo of Zilis

because Siwak and the editors of the Publications had reviewed Zilis's actual image

and were familiar with her appearance.  But they either intentionally disregarded the

dissimilarity or recklessly published Doe's image instead.

21.     *Us Weekly **knew*** what Zilis looked like.  *Us Weekly* staff reviewed

many images of Zilis while scrolling through her Twitter feed to find the photo they

ultimately used for the articles.  Indeed, the tweet from which *Us Weekly* grabbed

the image of Doe tagged ***Doe herself***.  The tweet in no way indicated it was an image

of Zilis.  On the contrary, the fact that Doe was tagged in the tweet was an

unmistakable indication that she, not Zilis, was the subject of the image in the Tweet.

Despite knowing that the image was likely of a person tagged in the tweet—as is

typical for social media posts tagging other people—*Us Weekly* did not conduct any

further research into whether the person in the image was Zilis.

22.     On top of that, images of Zilis are easy to find because she was (and is)

a prominent person.  In 2015, for example, Zilis was listed as one of *Forbes*'s 30

Under 30 in the venture capital sector.  Her LinkedIn profile, personal website,

Twitter account, and Forbes profile all contain publicly available photos of her.  And

*Us Weekly*'s direct competitors in the tabloid industry had, in their earlier reports on

Zilis's and Musk's twins, featured photos of Zilis.

23.     Indeed, both articles *Us Weekly* published about Zilis also included—further down in the body of each article—a photo of the real Zilis, which showed her to look nothing like Doe, whose image *Us Weekly* used at the top of its articles. Having seen many images of Zilis, *Us Weekly*'s editors and staff knew what Zilis actually looked like, but went ahead with publishing a photo of an obviously different person, likely because (1) the photo was a candid photo that stood in stark contrast to Zilis's carefully curated public image; (2) *Us Weekly* was rushing to publish something eye-catching about the mother of Musk's recently discovered twins; and (3) the photo of Doe was (for obvious reasons) one that had not been published in any other tabloid's reporting on Zilis's and Musk's twins, meaning it would be more likely to draw potential readers' attention.

24.     *Us Weekly*'s knowing or reckless disregard of the many, obvious differences between Zilis's and Doe's appearances led it to portray Doe—a scrupulously private person who has never sought any kind of celebrity status—as Musk's paramour and the secret mother of his children.  The Publications all invited readers to conclude either (1) that Doe was Zilis or (2) that Doe, rather than Zilis, was really the mother of Musk's twins (*i.e.*, that *Us Weekly* had named the wrong person in its articles).  Either way, readers of the Publications who then saw Doe in

public would, and did, naturally—but wrongly—conclude that she was the woman who had an illicit, sexual relationship with Musk.

25.    *Us Weekly* published Doe's image to a global audience of millions.  It did so, not just once, but on at least three separate instances—in the two articles and the Instagram story, all published on July 7, 2022.

**Doe Learns of the Publications from a Friend Living Abroad**

26.    On the morning of July 7, 2022, Doe was blissfully unaware that *Us Weekly* was about to drag her into one of its typically tawdry and salacious tabloid-style narratives.  At the time, she was about two days into a family vacation with her husband and their young child.  They were on their way to get together with Doe's childhood best friend's family for an annual reunion.

27.    During the day, though, Doe was contacted by a friend living in London.  The friend was in shock after seeing the articles with Doe's image, and reached out to Doe directly, asking, "What is this?"

28.    Doe went online and saw her image in the *Us Weekly* Publications.  She was incensed and overwhelmed with anxiety.  Doe had spent the bulk of her adult life deliberately maintaining a low profile and keeping her life private, including by staying off most social media.  Particularly because she works in the tech industry— a field that is notoriously male-dominated and judgmental of women—Doe has

assiduously avoided associating herself with anything like public impropriety or scandal.  Doing so was and is vital to her professional goals.  Now, though, *Us Weekly* had represented to the world that Doe had an affair with Musk.  And it had done so on the day she was due to reconnect with her childhood best friend and that friend's family.  She was humiliated and afraid.

29.    Doe immediately dropped everything and set to work trying to get her image removed from the *Us Weekly* Publications.  She contacted a lawyer who helped her track down the phone number of Siwak, the New York-based reporter who had written both articles.  The lawyer then informed Siwak that the images in the article were photos of Doe, not Zilis, and demanded they be taken down.  Siwak agreed to flag the issue for her publishers and, after several more hours passed, *Us Weekly* finally removed the images and replaced them with images of Zilis, conceding the original photo had not been of Zilis.

30.    Although Doe is not certain exactly how long her image remained atop the articles, by the time she saw the Instagram story linking to one of the articles, it had been up for 18 hours.  Removal took several hours more.

31.    On information and belief, the image of Doe was published on *Us Weekly*'s website (in the two articles) and Instagram (in the Instagram story) for between 24 and 48 hours.

32.    By the time *Us Weekly* finally removed Doe's image from the Publications, it was too late: they had already been spread across the internet.  Many websites, including websites maintained by major platforms like AOL and MSN, continued to feature Doe's image, chiefly thanks to syndication agreements with *Us Weekly*.  Even today, several of those websites continue to feature the *Us Weekly* articles with Doe's image.[5]  They do so because, although *Us Weekly* eventually removed Doe's photos from the copies of the Publications posted to its online platforms, it still has done nothing to ensure that other websites that syndicated *Us Weekly*'s reporting make the same change.

33.    Because of the syndication agreements, it was entirely foreseeable to *Us Weekly*—indeed, *Us Weekly* **knew**—that the Publications would be republished by a whole host of websites.  *Us Weekly* **knew**, moreover, that—unless it prompted the other websites to publish the updated versions of the *Us Weekly* articles (the ones without Doe's picture), Doe's image would remain attached to *Us Weekly*'s reporting on Musk and his twins.

---

[5] *See, e.g.*, *Elon Musk Welcomed Twins With Exec Shivon Zilis Before Daughter With Grimes*, MSN.com (July 7, 2022), https://www.msn.com/en-us/autos/news/elon-musk-welcomed-twins-with-exec-shivon-zilis-before-daughter-with-grimes/vp-AAZk5Qz (last visited June 19, 2023).

34.    In the Publications' aftermath, Doe was horrified to discover that her image came up early in many different internet searches about Musk and Zilis, including in searches for terms like "Elon Musk," "Us Weekly Shivon Zilis," and "Elon Musk twins."  Even today, a Google user searching "Us Weekly Elon Musk twins" will find a photo of Doe in the very first batch of search results.  If the user clicks on the photo, he or she will be taken to a version of one of the *Us Weekly* publications—still featuring Doe's photo—that is still posted on one of the websites that syndicated the *Us Weekly* Publications.

35.    Not long after *Us Weekly* disseminated the Publications, Doe's representatives reached out to A360.  In the course of that exchange, the only justification proffered by A360 for its publication of Doe's photo in place of Zilis' was a suggestion that Zilis resembles Doe.  But even the most cursory comparison would leave no doubt that the two are different people.  Zilis is much taller than Doe, and has a different eye color, hair color, bone structure in her face, and hairline.  Indeed, despite the fact that the two lived together for a year and socialized in the same circles for years afterward, Doe was never once mistaken for Zilis.  Nothing short of pure recklessness or deliberate disregard could plausibly explain what happened here.

**Us Weekly's Defamatory Articles and Instagram Story
Damage Doe in Her Personal and Professional Lives.**

36.     Depicting Doe as having conceived twins with Elon Musk is defamatory *per se*. *Us Weekly* portrayed Doe, a married woman and mother, in a way that suggested she engaged in adultery and bore twins out of wedlock with one of the world's most controversial business moguls, a man who himself had a famous girlfriend with whom he also conceived a child during the same time frame. Thanks to *Us Weekly*, Doe's image is indelibly linked to that seedy story.

37.     Because *Us Weekly*'s use of Doe's image was defamatory *per se*, Doe is entitled to presumed damages without having to show that she suffered actual harm.

38.     But the fact is that Doe has suffered considerable reputational, economic, and psychological harm due to *Us Weekly*'s defamation—harm that has manifested in personal and professional interactions.

39.     For example, Doe has experienced shame and humiliation from being questioned about the Publications by colleagues and acquaintances. At multiple gatherings, in the presence of other people, she was forced to acknowledge the reporting and expressly deny having any connection with Musk.

40.     Acquaintances mocked Doe and her husband about the Publications, including teasing Doe's husband that he "married Elon's ex."

14

41.    As the Publications foreseeably spread across the internet, Doe suddenly found people staring at her in numbers and ways that she had never before experienced.  The most obvious—and, really, only—explanation for the sudden increased and unwanted attention was that the people staring at her recognized her from the *Us Weekly* articles.  That realization frequently left Doe humiliated and ashamed when she ventured out in public.

42.    The humiliation Doe felt at standing falsely accused of having Musk's children—and cheating on her husband—was especially acute when she ventured out in public with her husband and their young child.  For that reason, after *Us Weekly* released the Publications, Doe significantly curtailed her visiting friends and family, preferring to stay home to avoid being recognized, subjected to humiliating comments, or otherwise unfairly judged and stigmatized.

43.    Even then, though, Doe still found herself being recognized and associated with the Publications.  Indeed, since the Publications were released, Doe has overheard complete strangers gossiping about her reported connection to Musk.

44.    The damage to Doe's reputation from the Publications and the shame she feels every time someone associates her with them has adversely affected Doe's career as well.  Doe's job as an executive in the tech sector typically requires her to be in the office on a regular basis and to interact with clients.  After the Publications,

though, Doe began avoiding going into the office or meeting with clients, just to reduce the likelihood that a colleague or client might identify her as the woman from the Publications.

45.    In the months following release of the Publications, Doe noticed a decline in her job performance.  Whereas, before the release of the Publications, Doe had established a sterling reputation for her work—winning numerous awards and promotions—after the release of the Publications, she began having trouble concentrating, distracted as she was by her association with the Publications.

46.    The Publications similarly hobbled Doe as she searched out new job opportunities.  Prior to *Us Weekly*'s release of the Publications, Doe had begun looking for new challenges and chances to advance in her profession.  Her job search had been proceeding well and she had already received several encouraging responses—unsurprisingly, given her strong résumé and work history.  But after the Publications' release, Doe became distracted and anxious in her job search, constantly worrying about how prospective employers would evaluate her in light of her connection to the tabloid stories about Musk and his twins.  Especially given the tech sector's well-publicized struggles with sexism and misogyny,[6] Doe's concerns

---

[6] *See, e.g.*, Emily Chang, *Brotopia: Breaking Up the Boys' Club of Silicon Valley* (Portfolio/Penguin 2019).

that prospective employers might punish her for the reported relationship with Musk were (and are) entirely plausible.  Doe's impaired performance in her job search may have caused her to be passed over for multiple lucrative and rewarding job opportunities, potentially worth millions of dollars.

47.     Separate and apart from impairing her own personal brand, Doe's association with the Publications has also threatened her husband's career.  Doe's husband co-owns a business advising government and corporate clients who are, understandably, quite sensitive to reputational risks.   Protecting her husband's business was another reason Doe had worked so hard to cultivate a respectable public image.  It was thus particularly devastating for her to have been falsely portrayed as having cheated on her husband and conceived children with Musk.

48.     The humiliation and stress from the Publications also forced Doe to seek professional care from a therapist and psychiatrist, who treated her for acute anxiety and hypervigilance.  At times, the trauma she experienced in connection with the Publications was so overwhelming that she required multiple therapy sessions per week just to cope.  Those sessions have cost Doe and her husband thousands of dollars already.

49.     When it became clear that therapy alone would not resolve the trauma, Doe's treating psychiatrist placed her on medication.   While the medication

somewhat alleviated some of Doe's symptoms, it made her feel distracted and irritated and further impaired her work performance. Doe would not have been forced to undergo any of that had *Us Weekly* simply refrained from including Doe's image in the Publications.

50.     The harm to Doe from the Publications, moreover, is unlikely to resolve anytime soon. Versions of the *Us Weekly* Publications featuring Doe's picture remain on various websites across the internet—a development that was entirely foreseeable to *Us Weekly* when it issued the Publications.

51.     And Musk continues to be front-page news. One reason for that is his recent announcement that Neuralink—where Zilis serves as director of operations, reporting directly to Musk—will begin testing its technology on humans in the near future. As a consequence of Musk's continued prominence, Doe constantly finds herself in situations where Musk is a topic of conversation and where she must confront anew the stigma and humiliation that come from being portrayed (falsely) as an adulterer and the mother of Musk's twins.

## COUNT ONE:
## DEFAMATION

52.     Doe repeats and re-alleges Paragraphs 1-51 as if set forth fully herein.

53.     At all times pertinent to this complaint, Defendant A360 owned, controlled, and published *Us Weekly*.  Defendant was and is responsible for the content of *Us Weekly*'s reporting.

54.     On July 7, 2022, Defendant, as publisher of *Us Weekly,* published false and defamatory representations and implications about Doe to *Us Weekly*'s readers on *Us Weekly*'s website in an article authored by Miranda Siwak and headlined *Who is Shivon Zilis? 5 Things to Know About the Neuralink Executive Who Welcomed Twins with Elon Musk*.

55.     The article purported to identify the woman who gave birth to twins with Elon Musk and, by publishing Doe's photograph atop the article, stated and implied that Doe had an extramarital affair with Musk and conceived children with him, all within weeks of Musk's conceiving another child with his girlfriend.

56.     The statement and its implication were representations of fact and were reasonably understood by readers as representations of fact.  People who saw the article reasonably understood it as conveying that Doe had an extramarital affair with Musk and conceived children with him, all within weeks of his conceiving another child with his girlfriend.  In fact, Doe has overheard complete strangers gossiping about her (nonexistent) relationship with Musk.

57.    The statement and implication are of and concerning Doe.  Indeed, the statement identifies Doe by her photograph.  People who saw the article reasonably understood it as conveying that Doe had an extramarital affair with Musk and conceived children with him, all within weeks of his conceiving another child with his girlfriend.  Again, this is not conjecture; in public, Doe has overheard complete strangers gossiping about her (non-existent) relationship with Musk.

58.    The statement and implication are false.  Doe did not have an extramarital affair with Musk and did not conceive any children with him.  In fact, Doe does not know and has never met Musk.  Doe has never been romantically involved with anyone other than her husband since she and her husband began dating, and Doe's only child is the one she gave birth to in 2020, fathered by her husband.

59.    The statement and implication are defamatory, and readers understood them to be defamatory, because they tend to expose Doe to public contempt, ridicule, aversion, and disgrace; to discourage others from associating or dealing with Doe; and to harm Doe's reputation in the estimation of the community.

60.    The statement and implication are defamatory *per se* because they impute unchastity and infidelity to Doe.

20

61.    The statement and implication have caused Doe to suffer significant psychological, mental, and emotional harm that has manifested in and impaired her personal and professional interactions.  The monetary value of that harm exceeds $75,000.

62.    The statement and implication have caused Doe's reputation as a devoted and faithful wife and mother to be unjustly impugned.

63.    As a direct and proximate result of the harm caused by the statement and implication, Doe has also been forced to seek out and pay for treatment from a therapist and a psychiatrist and to take medication to attempt to mitigate and lessen that harm.  The cost of Doe's medical treatment alone has been thousands of dollars, not including the value of the time Doe has spent receiving treatment and the cost and harm of the side effects of the medication she was prescribed.

64.    Doe's performance at work suffered as a direct and proximate result of the false and defamatory statement and implication because they caused her to be extremely distracted, nervous about her job performance, and often unable to bring herself to even go into the office or meet with colleagues or clients.  The medication prescribed by Doe's psychiatrist to treat the anguish caused by the statement and implication exacerbated the distraction and compounded it with irritation that further impaired Doe's job performance.

65.    As a direct and proximate result of the harm caused by the statement and implication, Doe's search for new employment opportunities was substantially impaired because, throughout critical parts of her job search, Doe was distracted and preoccupied about how prospective employers would view her in light of her association with the statement and implication.  That anxiety undermined Doe's opportunities to obtain jobs that would have advanced her career and considerably increased her salary.

66.    Because of the harm caused by the false and defamatory statement and implication, and to avoid the negative fallout from it, Doe significantly curtailed her interpersonal interactions for an extended period of time.

67.    Defendant had no applicable privilege or legal authorization to publish the statement and implication or, if it did, abused that privilege.

68.    Defendant published the statement and implication with actual malice in that Defendant knew the statement was false or published them with reckless disregard for their truth or falsity.

69.    Before publishing the statement and implication, Defendant knowingly or recklessly disregarded information available to it showing that the woman whose image was featured in the Publications was not Zilis, thus demonstrating Defendant's actual malice in publishing them.

70.     Defendant published the statement and implication with actual malice as evidenced by the fact that it disregarded proper journalistic standards by publishing Doe's image without taking appropriate steps to verify that the image was of Zilis.

71.     Defendant published the statement and implication with actual malice as evidenced by the fact it failed to pursue further investigation despite obvious signs that they were false, including, but not limited to, (1) the fact that the Twitter post from which *Us Weekly* grabbed the image of Doe tagged Doe, suggesting that she (not Zilis) was the one pictured, and (2) clear differences in the appearances of Doe and Zilis, as reflected in publicly available images of Zilis—suggesting that the image atop the Publications was not an image of Zilis.

72.     Defendant published the statement and implication with actual malice as evidenced by the fact it did not employ any reasonable screening or checking procedures to ascertain whether the image it was using at the top of the article was of Zilis.

73.     Defendant published the statement and implication with actual malice as evidenced the fact that it rushed to publish them purely to obtain economic benefits from quick publication despite failing to conduct a reasonable investigation of who was pictured in the photograph (Doe, not Zilis).   Defendant could have

confirmed the identity of the person in the photograph (Doe, not Zilis) with only a minute or two of effort.

74.     For the above reasons, Defendant's publication of the false and defamatory statement and implication was also negligent at a minimum, as further evidenced by its failure to exercise even ordinary care in publishing Doe's photograph without first confirming the identity of the person in that photograph and Defendant's unreasonable conclusion that, because the image of Doe came from Zilis's Twitter profile, it was an image of Zilis (it was not).

75.     The statement and its implication were foreseeably republished by websites around the world, including by websites that had syndication agreements with *Us Weekly*.

76.     Defendant published the statement and implication willfully, wantonly and with a conscious and reckless disregard for Doe's rights.  Accordingly, punitive damages are appropriate.

## COUNT TWO:
## DEFAMATION

77.     Doe repeats and re-alleges Paragraphs 1-76 as if set forth fully herein.

78.     At all times pertinent to this complaint, A360 owned, controlled, and published *Us Weekly*.  A360 was and is responsible for the content of *Us Weekly*'s reporting.

79.     On July 7, 2022, Defendant, as publisher of *Us Weekly,* published false and defamatory representations and implications about Doe to *Us Weekly*'s readers on *Us Weekly*'s website in an article authored by Miranda Siwak and headlined *Elon Musk Quietly Welcomed Twins with Neuralink Executive Weeks Before Daughter With Grimes Was Born*.

80.     The article purported to identify the woman who gave birth to twins with Elon Musk and, by publishing Doe's photograph atop the article, stated and implied that Doe had an extramarital affair with Musk and conceived children with him, all within weeks of Musk's conceiving another child with his girlfriend.

81.     The statement and its implication were representations of fact and were reasonably understood by readers as representations of fact.  People who saw the article reasonably understood it as conveying that Doe had an extramarital affair with Musk and conceived children with him, all within weeks of his conceiving another child with his girlfriend.  In fact, Doe has overheard complete strangers gossiping about her (nonexistent) relationship with Musk.

82.     The statement and implication are of and concerning Doe.  Indeed, the statement identifies Doe by her photograph.  People who saw the article reasonably understood it as conveying that Doe had an extramarital affair with Musk and conceived children with him, all within weeks of his conceiving another child with

his girlfriend.  Again, this is not conjecture; in public, Doe has overheard complete strangers gossiping about her (non-existent) relationship with Musk.

83.    The statement and implication are false.  Doe did not have an extramarital affair with Musk and did not conceive any children with him.  In fact, Doe does not know and has never met Musk.  Doe has never been romantically involved with anyone other than her husband since she and her husband began dating, and Doe's only child is the one she gave birth to in 2020, fathered by her husband.

84.    The statement and implication are defamatory, and readers understood them to be defamatory, because they tend to expose Doe to public contempt, ridicule, aversion, and disgrace; to discourage others from associating or dealing with Doe; and to harm Doe's reputation in the estimation of the community.

85.    The statement and implication are defamatory *per se* because they impute unchastity and infidelity to Doe.

86.    The statement and implication have caused Doe to suffer significant psychological, mental, and emotional harm that has manifested in and impaired her personal and professional interactions.  The monetary value of that harm exceeds $75,000.

87.   The statement and implication have caused Doe's reputation as a devoted and faithful wife and mother to be unjustly impugned.

88.   As a direct and proximate result of the harm caused by the statement and implication, Doe has also been forced to seek out and pay for treatment from a therapist and a psychiatrist and to take medication to attempt to mitigate and lessen that harm.  The cost of Doe's medical treatment alone has been thousands of dollars, not including the value of the time Doe has spent receiving treatment and the cost and harm of the side effects of the medication she was prescribed.

89.   Doe's performance at work suffered as a direct and proximate result of the false and defamatory statement and implication because they caused her to be extremely distracted, nervous about her job performance, and often unable to bring herself to even go into the office or meet with colleagues or clients.  The medication prescribed by Doe's psychiatrist to treat the anguish caused by the statement and implication exacerbated the distraction and compounded it with irritation that further impaired Doe's job performance.

90.   As a direct and proximate result of the harm caused by the statement and implication, Doe's search for new employment opportunities was substantially impaired because, throughout critical parts of her job search, Doe was distracted and preoccupied about how prospective employers would view her in light of her

association with the statement and implication. That anxiety undermined Doe's opportunities to obtain jobs that would have advanced her career and considerably increased her salary.

91.    Because of the harm caused by the false and defamatory statement and implication, and to avoid the negative fallout from it, Doe significantly curtailed her interpersonal interactions for an extended period of time.

92.    Defendant had no applicable privilege or legal authorization to publish the statement and implication or, if it did, abused that privilege.

93.    Defendant published the statement and implication with actual malice in that Defendant knew the statement was false or published them with reckless disregard for their truth or falsity.

94.    Before publishing the statement and implication, Defendant knowingly or recklessly disregarded information available to it showing that the woman whose image was featured in the Publications was not Zilis, thus demonstrating Defendant's actual malice in publishing them.

95.    Defendant published the statement and implication with actual malice as evidenced by the fact that it disregarded proper journalistic standards by publishing Doe's image without taking appropriate steps to verify that the image was of Zilis.

96.     Defendant published the statement and implication with actual malice as evidenced by the fact it failed to pursue further investigation despite obvious signs that they were false, including, but not limited to, (1) the fact that the Twitter post from which *Us Weekly* grabbed the image of Doe tagged Doe, suggesting that she (not Zilis) was the one pictured, and (2) clear differences in the appearances of Doe and Zilis, as reflected in publicly available images of Zilis—suggesting that the image atop the Publications was not an image of Zilis.

97.     Defendant published the statement and implication with actual malice as evidenced by the fact it did not employ any reasonable screening or checking procedures to ascertain whether the image it was using at the top of the article was of Zilis.

98.     Defendant published the statement and implication with actual malice as evidenced the fact that it rushed to publish them purely to obtain economic benefits from quick publication despite failing to conduct a reasonable investigation of who was pictured in the photograph (Doe, not Zilis).  Defendant could have confirmed the identity of the person in the photograph (Doe, not Zilis) with only a minute or two of effort.

99.     For the above reasons, Defendant's publication of the false and defamatory statement and implication was also negligent at a minimum, as further

evidenced by its failure to exercise even ordinary care in publishing Doe's photograph without first confirming the identity of the person in that photograph and Defendant's unreasonable conclusion that, because the image of Doe came from Zilis's Twitter profile, it was an image of Zilis (it was not).

100.   The statement and its implication were foreseeably republished by websites around the world, including by websites that had syndication agreements with *Us Weekly*.

101.   Defendant published the statement and implication willfully, wantonly and with a conscious and reckless disregard for Doe's rights.  Accordingly, punitive damages are appropriate.

**COUNT THREE:**
**DEFAMATION**

102.   Doe repeats and re-alleges Paragraphs 1-101 as if set forth fully herein.

103.   At all times pertinent to this complaint, A360 owned, controlled, and published *Us Weekly*.  A360 was and is responsible for the content of *Us Weekly*'s reporting.

104.   On July 7, 2022, Defendant, as publisher of *Us Weekly,* published false and defamatory representations and implications about Doe to *Us Weekly*'s followers on *Us Weekly*'s Instagram account in an Instagram story with the words

"Who is Shivon Zilis? 5 Things to Know About the Neuralink Executive Who Welcomed Twins with Elon Musk."

105.  The banner photo for the Instagram story—*i.e.*, the image shown to every one of *Us Weekly*'s Instagram followers who viewed the story—purported to show the woman who gave birth to twins with Elon Musk.  By using a photo of Doe as the banner photo, the Instagram story stated and implied that Doe had an extramarital affair with Musk and conceived children with him, all within weeks of Musk's conceiving another child with his girlfriend.

106.  The statement and implication were representations of fact and were reasonably understood by readers as representations of fact.  People who saw the Instagram story reasonably understood it as conveying that Doe had an extramarital affair with Musk and conceived children with him, all within weeks of his conceiving another child with his girlfriend.  In fact, Doe has overheard complete strangers gossiping about her (non-existent) relationship with Musk.

107.  The statement and implication are of and concerning Doe.  Indeed, the statement identifies Doe by her photograph.  People who saw the article reasonably understood it as conveying that Doe had an extramarital affair with Musk and conceived children with him, all within weeks of his conceiving another child with

his girlfriend.  Again, this is not conjecture; in public, Doe has overheard complete strangers gossiping about her (non-existent) relationship with Musk.

108.   The statement and implication are false.   Doe did not have an extramarital affair with Musk and did not conceive any children with him.  In fact, Doe does not know and has never met Musk.  Doe has never been romantically involved with anyone other than her husband since she and her husband began dating, and Doe's only child is the one she gave birth to in 2020, fathered by her husband.

109.   The statement and implication are defamatory, and readers understood them to be defamatory, because they tend to expose Doe to public contempt, ridicule, aversion, and disgrace; to discourage others from associating or dealing with Doe; and to harm Doe's reputation in the estimation of the community.

110.   The statement and implication are defamatory *per se* because they impute unchastity and infidelity to Doe.

111.   The statement and implication have caused Doe to suffer significant psychological, mental, and emotional harm that has manifested in and impaired her personal and professional interactions.  The monetary value of that harm exceeds $75,000.

112.   The statement and implication have caused Doe's reputation as a devoted and faithful wife and mother to be unjustly impugned.

113.   As a direct and proximate result of the harm caused by the statement and implication, Doe has also been forced to seek out and pay for treatment from a therapist and a psychiatrist and to take medication to attempt to mitigate and lessen that harm.  The cost of Doe's medical treatment alone has been thousands of dollars, not including the value of the time Doe has spent receiving treatment and the cost and harm of the side effects of the medication she was prescribed.

114.   Doe's performance at work suffered as a direct and proximate result of the false and defamatory statement and implication because they caused her to be extremely distracted, nervous about her job performance, and often unable to bring herself to even go into the office or meet with colleagues or clients.  The medication prescribed by Doe's psychiatrist to treat the anguish caused by the statement and implication exacerbated the distraction and compounded it with irritation that further impaired Doe's job performance.

115.   As a direct and proximate result of the harm caused by the statement and implication, Doe's search for new employment opportunities was substantially impaired because, throughout critical parts of her job search, Doe was distracted and preoccupied about how prospective employers would view her in light of her

association with the statement and implication. That anxiety undermined Doe's opportunities to obtain jobs that would have advanced her career and considerably increased her salary.

116. Because of the harm caused by the false and defamatory statement and implication, and to avoid the negative fallout from it, Doe significantly curtailed her interpersonal interactions for an extended period of time.

117. Defendant had no applicable privilege or legal authorization to publish the statement and implication or, if it did, abused that privilege.

118. Defendant published the statement and implication with actual malice in that Defendant knew the statement was false or published them with reckless disregard for their truth or falsity.

119. Before publishing the statement and implication, Defendant knowingly or recklessly disregarded information available to it showing that the woman whose image was featured in the Publications was not Zilis, thus demonstrating Defendant's actual malice in publishing them.

120. Defendant published the statement and implication with actual malice as evidenced by the fact that it disregarded proper journalistic standards by publishing Doe's image without taking appropriate steps to verify that the image was of Zilis.

121.   Defendant published the statement and implication with actual malice as evidenced by the fact it failed to pursue further investigation despite obvious signs that they were false, including, but not limited to, (1) the fact that the Twitter post from which *Us Weekly* grabbed the image of Doe tagged Doe, suggesting that she (not Zilis) was the one pictured, and (2) clear differences in the appearances of Doe and Zilis, as reflected in publicly available images of Zilis—suggesting that the image atop the Publications was not an image of Zilis.

122.   Defendant published the statement and implication with actual malice as evidenced by the fact it did not employ any reasonable screening or checking procedures to ascertain whether the image it was using in the Instagram story was of Zilis.

123.   Defendant published the statement and implication with actual malice as evidenced the fact that it rushed to publish them purely to obtain economic benefits from quick publication despite failing to conduct a reasonable investigation of who was pictured in the photograph (Doe, not Zilis).  Defendant could have confirmed the identity of the person in the photograph (Doe, not Zilis) with only a minute or two of effort.

124.   For the above reasons, Defendant's publication of the false and defamatory statement and implication was also negligent at a minimum, as further

evidenced by its failure to exercise even ordinary care in publishing Doe's photograph without first confirming the identity of the person in that photograph and Defendant's unreasonably conclusion that, because the image of Doe came from Zilis's Twitter profile, it was an image of Zilis (it was not).

125.   The statement and its implication were foreseeably republished by websites around the world, including by websites that had syndication agreements with *Us Weekly*.

126.   Defendant published the statement and implication willfully, wantonly and with a conscious and reckless disregard for Doe's rights.  Accordingly, punitive damages are appropriate.

## COUNT FOUR:
## VIOLATION OF N.Y. CIVIL RIGHTS LAW §§ 50-51

127.   Plaintiff repeats and re-alleges Paragraphs 1-126 as if set forth fully herein.

128.   Defendant as publisher of *Us Weekly* and through its agents, violated N.Y. Civil Rights Law §§ 50-51 by invading Doe's privacy, misappropriating her likeness, and publishing an image of Doe in articles on the *Us Weekly* website and on the *Us Weekly* Instagram account in a way that falsely represented that Doe had an extramarital affair with Musk and conceived children with him, all within weeks of his conceiving another child with his girlfriend.

129.   At all relevant times, Defendant used and operated *Us Weekly*'s website and Instagram account for advertising and trade purposes.

130.   *Us Weekly*'s website and Instagram account were designed to attract readers to *Us Weekly* and to generate revenue for Defendant.  For example, the entire point of the Instagram story featuring Doe's image was to cause readers to click the link in the story, which would re-direct them to Defendant's website, thereby increasing the website's profitability.

131.   Upon information and belief, Defendant's use of Doe's images did in fact attract readers to *Us Weekly* and generate revenue for Defendant.

132.   At no point did Defendant ever receive permission or consent, be it written or otherwise, to use Doe's image on any of its websites or social media accounts.

133.   Defendant was at all relevant times aware that it never received Doe's permission or consent to use her image on any website or social media account, or on any other medium, in order to promote any of A360's publications.

134.   At no point did Defendant ever compensate Doe for its use of her images.

135.   Doe's image had no real relationship to the substance of the Publications.[7]

136.   Defendant's use of Doe's image infected the Publications with substantial fictionalization or falsification.

137.   No applicable privilege or authorization exists for Defendant's use of Doe's image in the Publications.

138.   The Publications, with Doe's image, were distributed, via the internet, throughout the State of New York, as well as across the globe.

139.   Defendant's use of Doe's image was done with actual malice, in that Defendant knew Doe had no connection to the content of the Publications or recklessly disregarded information establishing that Doe lacked any such connection.

140.   Before issuing the Publications, Defendant knowingly or recklessly disregarded information available to it showing that the woman whose image was

---

[7] As a reminder, "the Publications" refers to the Instagram story with the caption "Who Is Shivon Zilis? 5 Things to Know About the Neuralink Executive Who Welcomed Twins with Elon Musk," and the two articles—one titled *Who Is Shivon Zilis?  5 Things to Know About the Neuralink Executive Who Welcomed Twins with Elon Musk*, the other titled *Elon Musk Quietly Welcomed Twins with Neuralink Executive Weeks Before Daughter With Grimes Was Born*—Defendant published on July 7, 2022.

featured in the Publications was not Zilis, thus demonstrating Defendant's actual malice in repeatedly publishing Doe's image in articles to which she bore no relationship.

141.   Defendant published the statement and implication with actual malice as evidenced by the fact that it disregarded proper journalistic standards by publishing Doe's image without taking appropriate steps to verify that the image was of Zilis.

142.   Defendant published Doe's image with actual malice as evidenced by the fact it failed to pursue further investigation despite obvious signs that the woman pictured in the photo featured in the Publications was Doe, not Zilis.  Those signs included, but were not limited to, (1) the fact that the Twitter post from which *Us Weekly* grabbed the image of Doe tagged Doe, suggesting that she (not Zilis) was the one pictured, and (2) clear differences in the appearances of Doe and Zilis, as reflected in publicly available images of Zilis—suggesting that the image atop the Publications was not an image of Zilis.

143.   Defendant published Doe's image with actual malice as evidenced by the fact it did not employ any reasonable screening or checking procedures to ascertain whether the image featured in the Publications was of Zilis.

144.    Defendant published Doe's image with actual malice as evidenced the fact that it rushed to publish the image purely to obtain economic benefits from quick publication, despite failing to conduct a reasonable investigation of who was pictured in the photograph (Doe, not Zilis).  Defendant could have confirmed the identity of the person in the photograph (Doe, not Zilis) with only a minute or two of effort.

145.  Doe's image, as featured in the Publications, was foreseeably republished by websites around the world, including by websites that had syndication agreements with *Us Weekly*.

146.    Defendant's featuring of Doe's image in the Publications has directly and foreseeably impaired Doe's reputation as a faithful wife, mother, and professional; caused her to suffer significant psychological, mental, and emotional harm in ways that have manifested in and impaired her personal and professional interactions; forced her to seek and pay for therapy and medication; and caused her significant distress, anguish, and fear.

147.    Defendant published Doe's image willfully, wantonly and with a conscious and reckless disregard for Doe's rights.  Accordingly, punitive damages are appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Doe respectfully requests that the Court enter judgment in Plaintiff Doe's favor, and against Defendant A360 as follows:

(1)     Awarding Doe actual, presumed, and punitive damages in an amount to be determined at trial; and

(2)     Awarding Doe all expenses and costs, including attorneys' fees and interest, as authorized by law; and

(3)     Awarding Doe such other and additional relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: July 3, 2023                                     Respectfully submitted,

                                                       */s/ G. Taylor Wilson*

Thomas A. Clare, P.C.*                                 G. Taylor Wilson
Mark Thomson*                                          Georgia Bar No. 460781
CLARE LOCKE LLP                                        WADE GRUNBERG & WILSON, LLC
10 Prince Street                                       600 Peachtree St NE, Suite 3900
Alexandria, VA 22314                                   Atlanta, GA 30308
Telephone: (202) 628-7400                              Telephone: (404) 301-3406
Email: tom@clarelocke.com                              Facsimile: (404) 969-4333
Email: mark@clarelocke.com                             Email: twilson@wgwlawfirm.com

**Pro hac vice* motions forthcoming

*Attorneys for Plaintiff Jane Doe*

## <u>CERTIFICATION UNDER L.R. 7.1D.</u>

Pursuant to Northern District of Georgia Civil Local Rule 7.1D, the undersigned counsel certifies that the foregoing document is a computer document and was prepared in Times New Roman 14 point font, as mandated in Local Rule 5.1C.

This 3rd day of July, 2023.

*/s/ G. Taylor Wilson*
G. Taylor Wilson