**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| JANE DOE,<br><br>        *Plaintiff*,<br><br>v.<br><br>A360 MEDIA LLC,<br><br>        *Defendant*. | Civil Case No. 1:23-cv-02954-VMC<br><br>JURY TRIAL DEMANDED |

## PLAINTIFF'S MOTION TO PROCEED PSEUDONYMOUSLY

Plaintiff Jane Doe moves to proceed pseudonymously.

In July 2022, the celebrity gossip publication *Us Weekly*—owned and operated by Defendant A360 Media LLC—published two articles and an Instagram story (collectively "the Publications") featuring photos of Doe in ways that falsely suggested she was the mother of Elon Musk's twins.  The Publications were disseminated to an audience of millions, then copied onto other websites, where they remain today.

Doe has never so much as met Musk, but her unwanted and unwarranted association with him and his twins has upended her life.  It has necessitated therapy and medication, forced Doe to drastically curtail her social life, and caused her job performance to suffer.

The one saving grace of this episode is that the Publications only used Doe's

image, not her name.  As a result, Doe and her family have retained at least a measure of separation from the continued public interest in Musk and his twins.  That separation will disappear if this Court requires Doe to reveal her identity as a condition of proceeding with this litigation.  From now till the end of the internet, web searches for Doe would turn up links and results about Musk and the Publications, and web searches about Musk and the Publications would turn links and results about Doe—inevitably leading people to wrongly conclude that Doe was, in fact, Musk's paramour.

If Doe is required to proceed with this litigation under her legal name, she will have to choose between associating her name with that deeply stigmatizing and intensely humiliating narrative, on the one hand, and abandoning her valid legal claim against A360, on the other.  "Justice," the Eleventh Circuit has emphasized, "should not carry such a high price."  *Plaintiff B. v. Francis*, 631 F.3d 1310, 1319 (11th Cir. 2011).[1]  For that reason, and as more fully set out below, this Court should grant Doe's motion for leave to proceed pseudonymously.

## BACKGROUND

In November 2021, Shivon Zilis, an executive at Elon Musk's Neuralink

---

[1] Unless otherwise noted, internal quotations and citations are omitted from legal citations and emphasis is added.

venture, gave birth to twins. In July 2022, reporters discovered that Musk, one of the world's most controversial moguls, was the twins' father, and that Zilis had given birth to the twins just weeks before Musk and his girlfriend, the musician Grimes, had welcomed their own child into the world.

Tabloids went wild, many speculating about whether Musk and Zilis had a workplace affair while Musk was still dating Grimes. *Us Weekly*, with its millions of readers and online subscribers, contributed to the media feeding frenzy by publishing an Instagram story and two articles—one titled *Elon Musk Quietly Welcomed Twins with Neuralink Executive Weeks Before Daughter With Grimes Was Born*, the other titled *Who Is Shivon Zilis? 5 Things to Know About the Neuralink Executive Who Welcomed Twins With Elon Musk*. *See* Attachment 1, Decl. of Jane Doe ¶ 2. There was a problem, though: While all three of the Publications named Zilis as the twins' mother, the featured photo in each of them was of Doe, who had been Zilis's roommate years earlier but who has never even met Musk. *See id.* People who saw the Publications thus came away with the false impression that Doe—who works in the tech industry—had been Musk's paramour. *See id.* ¶¶ 2-3.

For Doe, the consequences of that unfounded portrayal have been devastating. Strangers gossip about her reported relationship with Musk and his children. *Id.* ¶ 6.

Acquaintances ask embarrassing questions and make humiliating jokes. *Id.* Everywhere she goes, including on outings with her husband and their young child, she feels the gazes of passersby who believe, wrongly, that she was Musk's mistress. *Id.*

Just coping with the stress and strain has required continuous therapy and even medication. *Id.* ¶ 14. She has reduced her social life to the bare minimum, so concerned is she about being recognized from the Publications. *Id.* ¶ 6. Her performance at work and with clients suffered because of the anxiety and distraction she experienced as a result of the Publications. *Id.* ¶ 13.

Doe and her doctors worry that this litigation will have the perverse effect of amplifying her connection to the stories about Musk. *Id.* ¶¶ 16-17. Because the Publications did not use Doe's name, it is currently only Doe's physical image that is linked to Musk and his twins. *Id.* ¶ 17. Were Doe forced to bring this lawsuit in her own name, though, even that remaining separation would disappear. *Id.* Internet searches for Musk, his twins, and the *Us Weekly* articles would turn up, not just photos of Doe, but her name, while internet searches for Doe would turn up stories about Musk, the twins, and the Publications. *Id.* ¶¶ 17-18. Inevitably, users noticing these connections would conclude—as others have—that Doe was Musk's paramour and the mother of his twins. *Id.* ¶¶ 6, 18.

Doe has reached out repeatedly to A360—using her real identity—in an effort to avoid resorting to litigation in order to obtain compensation for the harms the Publications caused her. *Id.* ¶ 19. A360 knows who she is. *Id.* A360 also knows Doe never did anything to warrant being connected with the tawdry reporting and gossip about Musk and his twins. *Id.* This motion is Doe's last and best shot at receiving some degree of compensation for the harms the Publications caused her while also maintaining some level of distance from a story that has already thrown her life into disarray.

## ARGUMENT

While Federal Rule of Civil Procedure 10(a) generally requires that a complaint "name all the parties," that requirement is not absolute. In particular, when a plaintiff possesses a "substantial privacy right," courts often find that the "customary practice of disclosing the plaintiff's identity should yield to the plaintiff's privacy concerns." *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992).

Whether a plaintiff's right to privacy outweighs the presumption of openness is a "totality-of-the-circumstances question." *In re Chiquita Brands Int'l, Inc.*, 965 F.3d 1238, 1247 n.5 (11th Cir. 2020). The "first step" in answering that question is to consider whether the party seeking anonymity "(1) is challenging government activity; (2) would be compelled, absent anonymity, to disclose information of the

utmost intimacy; or (3) would be compelled, absent anonymity, to admit an intent to engage in illegal conduct and thus risk criminal prosecution." *Id.* at 1247 (quoting *Doe v. Stegall*, 635 F.2d 180, 185 (5th Cir. Unit A 1981)).  Next, the court "should carefully review *all* the circumstances of a given case," including, for instance, "the evidence regarding the amount of harm losing anonymity would cause the Plaintiffs," and "whether [the plaintiff's] anonymity pose[s] a unique threat of fundamental unfairness to the defendant," *Plaintiff B v. Francis*, 631 F.3d 1310, 1316-17 (11th Cir. 2011) (citing *Frank*, 951 F.2d at 323, and *Southern Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe*, 599 F.2d 707, 713 (5th Cir. 1979) (hereafter "*SMU*")).

Those considerations support granting Doe's motion.  This case concerns information of the utmost intimacy—specifically, accusations of adultery by a woman working in a notoriously misogynistic and male-dominated industry.  Ample evidence supports Doe's claim that she will suffer considerable, tangible harm from losing what anonymity she still has in connection with the Publications.  And there is no serious argument that allowing Doe to proceed pseudonymously will visit any unfairness on A360 or the public at large.  Accordingly, this Court should grant Doe's motion.

### A. This lawsuit concerns accusations of the utmost intimacy.

By using Doe's photo in the Publications, A360 cast her as Musk's paramour and, in the eyes of those who see her in public with her husband, as an adulterer. It is hard to conceive of a more intimate or sensitive accusation than being charged with carrying on a secret, extramarital affair—leading to children—with one of the world's wealthiest and most controversial moguls. Binding precedent establishes, for instance, that the children from such an illicit relationship would be permitted to proceed pseudonymously in cases concerning their status as "illegitimate" offspring. *SMU*, 599 F.2d at 712-13 (pseudonymity appropriate in case involving welfare rights of "illegitimate children"). And the suggestion that Doe and Musk had an adulterous relationship is least as intimate and sensitive as information about a person's religious beliefs or sexual orientation—two subjects the Eleventh Circuit has recognized can justify pseudonymity. *See Stegall*, 653 F.2d at 186 (religious beliefs); *Frank*, 951 F.2d at 324 (sexual orientation).

In considering whether a lawsuit involves information "of the utmost intimacy," courts in this Circuit pay special attention to whether the information is merely embarrassing or whether it implicates a stigma. *See, e.g.*, *Frank*, 951 F.2d at 324 (describing cases where "the social stigma attached to the plaintiff's disclosure was found to be enough to overcome the presumption of openness in court

7

proceedings"). Whereas information that is merely embarrassing generally will not justify proceeding under a pseudonym, information that implicates a stigma often will. *See Doe v. Neverson*, 820 Fed. App'x 984, 987-88 (11th Cir. 2020) (collecting and discussing cases).

Claims that a person committed adultery fit squarely into the latter camp. Indeed, the law has long regarded accusations of unchastity and adultery as so stigmatizing as to be defamatory *per se*, meaning their mere utterance is deemed to cause harm to their subject's reputation without further proof of damages. *E.g.*, *Time, Inc. v. Firestone*, 424 U.S. 448, 462 n.7 (1976) (reciting trial court's holding "that falsely accusing a woman of adultery is libelous *per se*"); *Szalay v. New York Am.*, 254 A.D. 249, 250 (1st Dep't 1938) (article accusing plaintiff of adultery "is libelous per se").

One reason accusations of adultery are regarded as so intimate and sensitive is the stigma that accompanies them—a stigma at least as old as the Bible and with a potency that has hardly diminished over the years. That stigma is why novelists through the ages—from Hawthorne to Tolstoy to Updike to Morrison to Yates to Coelho—have made adultery the basis for shaming and outcasting in some of their most famous works: Adultery is almost universally regarded as deeply disgraceful and reprehensible. Further, the stigma accompanying accusations falls most heavily

proceedings"). Whereas information that is merely embarrassing generally will not justify proceeding under a pseudonym, information that implicates a stigma often will. *See Doe v. Neverson*, 820 Fed. App'x 984, 987-88 (11th Cir. 2020) (collecting and discussing cases).

Claims that a person committed adultery fit squarely into the latter camp. Indeed, the law has long regarded accusations of unchastity and adultery as so stigmatizing as to be defamatory *per se*, meaning their mere utterance is deemed to cause harm to their subject's reputation without further proof of damages. *E.g.*, *Time, Inc. v. Firestone*, 424 U.S. 448, 462 n.7 (1976) (reciting trial court's holding "that falsely accusing a woman of adultery is libelous *per se*"); *Szalay v. New York Am.*, 254 A.D. 249, 250 (1st Dep't 1938) (article accusing plaintiff of adultery "is libelous per se").

One reason accusations of adultery are regarded as so intimate and sensitive is the stigma that accompanies them—a stigma at least as old as the Bible and with a potency that has hardly diminished over the years. That stigma is why novelists through the ages—from Hawthorne to Tolstoy to Updike to Morrison to Yates to Coelho—have made adultery the basis for shaming and outcasting in some of their most famous works: Adultery is almost universally regarded as deeply disgraceful and reprehensible. Further, the stigma accompanying accusations falls most heavily

on women. In fact, society has an entire vocabulary for women accused of adultery. They are "homewreckers," "delilahs," "side-pieces," and "the other women"—regarded with suspicion, derision, and outright contempt.

A given stigma can be especially sharp within distinct communities, and the Eleventh Circuit has held that such community-specific stigma can be an important consideration favoring the grant of motion to proceed pseudonymously. *E.g.*, *Neverson*, 820 Fed. App'x at 988 (reversing denial of motion to proceed pseudonymously where district court failed to properly consider special stigma attaching to accusations of sexual assault where plaintiff was from a "devout Muslim family"); *Stegall*, 653 F.2d at 186 (requiring district court to allow mother and children to proceed pseudonymously in suit challenging constitutionality of prayer in school, in part because of the "infamy" their particular community attached to their beliefs). In the tech sector, where Doe works, there is an especially strong stigma surrounding women's supposed sexual improprieties. *See* Doe Decl. ¶ 8. The unique magnitude of the tech sector's problems with sexism and misogyny has been well documented, as has the fact that women in tech who become connected to stories of sexual impropriety too often find themselves sexualized, marginalized, discredited, and harassed in ways that ultimately cost them clients, promotions, and

even jobs.² *Id.* ¶¶ 8-9. This is not to say sexism and misogyny are ubiquitous in all corners of the tech sector or that every woman in tech experiences them; but it is no exaggeration to say that there is hardly a woman in that sector who has not been told cautionary tales about other women's so-called "indiscretions" derailing their careers. *See id.* ¶ 9. Small wonder, then, that Doe is so afraid of having her name linked to reports about a sexual relationship with the most prominent mogul in the tech sector. *See id.* ¶ 12. Being branded as an adulterer anywhere is bad, but the consequences of such a label in the tech sector can be especially devastating.

Inside and outside the tech sector, a central reason for the stigma attaching to accusations of adultery is agency: People who engage in adultery are understood to have made a conscious choice to violate sacred, marital vows. That differentiates accusations of adultery from other events—like sexual assault or wrongful termination—that the Eleventh Circuit has said are merely embarrassing. *E.g.*,

---

² *See, e.g.*, Emily Chang, *Brotopia: Breaking Up the Boys' Club of Silicon Valley* (Portfolio/Penguin 2019) (laying out hundreds of pages of illustrations of sexism and misogyny in Silicon Valley); Anna Wiener, *Uncanny Velley: A Memoir* (MCD 2020) ("[At one tech company,] Sexism, misogyny, and objectification did not define the workplace—but they were everywhere. Like wallpaper, like air."); Vandana Singh, *The retention problem: Women are going into tech but are also being driven out*, Yahoo! Life (Mar. 3, 2023), *available at* https://shorturl.at/bctCD ("[O]ur research found that women's negative experiences range from minor to severe harassment, sexism, discrimination and misogyny to explicit death threats.").

*Francis*, 631 F.3d at 1316. In cases like those, the plaintiff is a victim of the alleged misconduct, such that there is a diminished risk of stigma, even if there is some risk that the plaintiff will feel embarrassment. Here, by contrast, the *Us Weekly* Publications painted Doe as having deliberately engaged in an extramarital, sexual relationship with one of the best-known and most controversial moguls on earth. The deliberate nature of the alleged misconduct makes this case much more like cases involving decisions to use birth control or obtain an abortion—in which courts have recognized that the stigma consideration militates against requiring the plaintiff to proceed under her real name. *See, e.g.*, *Aware Woman Ctr. for Choice*, 253 F.3d at 687 (abortion); *SMU*, 599 F.2d at 712-13 (discussing birth control).

Doe's concerns about stigma from being forced to associate herself with allegations of the utmost intimacy are, in short, precisely the sort the law recognizes as warranting a plaintiff in proceeding pseudonymously.

**B.     Substantial evidence shows that forcing Doe to identify herself in the complaint will cause her significant harm.**

Doe's concerns are also supported by ample record evidence, not just speculation. That fact, in turn, supports granting her motion to proceed pseudonymously. *See Francis*, 631 F.3d at 1317 ("evidence regarding the amount of harm losing anonymity would cause the Plaintiffs" favored pseudonymity); *Neverson*, 829 Fed. App'x at 988 (similar).

11

As Doe attests, the Publications have had serious ramifications for her health. The trauma from the Publications necessitated psychological therapy for Doe, sometimes multiple times a week. Doe Decl. ¶ 15. She was treated for acute anxiety and hypervigilance. *Id.* When therapy did not sufficiently improve her condition, she was prescribed medication, which brought its own debilitating side effects. *Id.* She has subsequently been advised to do everything she can to avoid amplifying the connection between herself and the Publications, out of concern that amplifying the connection could exacerbate her medical conditions. *Id.* ¶ 16.

That, in fact, is exactly what will happen if Doe's motion is denied. At present, the one measure of separation between Doe and the Publications is that the Publications used only her image, not her name. *See id.* ¶ 17. Thus, when internet users search for information about Doe, they are not directed to the Publications or to pages of results linking Doe to Musk and his twins. Likewise, the millions of internet users who regularly search for information about Musk or his family are not presently directed to any information about Doe or her family.

That residual measure of privacy will disappear if Doe is required to bring this suit in her real name. In her pleadings and briefs, Doe will of course do everything she can to emphasize that she has no real connection with Musk. But most people who come across Doe's court filings will never read them. Instead, they will see an

internet link or search result tying Doe to the Publications, or Musk, or his twins, and mistakenly perceive that link or result as confirmation that there is, in fact, some newsworthy connection between Doe and Musk. *See id.* ¶ 18.

Doe's concerns to that effect are not just idle speculation; they are backed up by scores of studies. A number of those studies show, for instance, that most internet users do not even click on links they find to news or other informational material; they simply read the headlines.[3] Others show that, of the few users who do click on links to informational materials, sizable majorities do not actually take the time to read those materials but, instead, merely scan the material very briefly and move on.[4] For most internet users (*i.e.*, most people), then, the contents of Doe's filings

---

[3] *E.g.*, Frank Maguire, *People Only Read Headlines These Days, But Smart Brands Can Make That Work For Them*, SHARETHROUGH (Mar. 24, 2016), *available at* https://www.sharethrough.com/blog/people-only-read-headlines-these-days-but-smart-brands-can-still-make-that-work-for-them (last visited June 13, 2023) (noting studies showing that between 60-80% of internet users get most of their news from headlines); Eytan Bakshy et al., *Exposure to ideologically diverse news and opinion on Facebook*, SCIENCE (June 2015), *available at* https://education.biu.ac.il/sites/education/files/shared/science-2015-bakshy-1130-2.pdf (last visited June 13, 2023) (average Facebook user only clicks on about 7% of the political news stories they see in their feed); Maksym Gabielkov et al., *Social Clicks: What and Who Gets Read on Twitter?*, ACM SIGMETRICS (June 2016), *available at* https://hal.inria.fr/hal-01281190/document (last visited June 13, 2023) (study showing that 59% of links shared on Twitter are not clicked at all).

[4] *E.g.*, Tony Haile, *What You Think You Know About the Web is Wrong*, TIME (Mar. 9, 2014), *available at* https://time.com/12933/what-you-think-you-know-about-the-

in this case will not make an impression. But if those same users encounter links or headlines referencing Doe's name along with Musk's, or the twins, or the Publications, the evidence suggests that a great many of them will misinterpret the links and headlines as proof of precisely the connection that Doe has fought so hard to dispel.[5]

The evidence shows, in short, that requiring Doe to litigate this case under her own name is likely to exacerbate the already serious harms she faces. That there is

---

web-is-wrong/ (last visited June 13, 2023) (of readers who visited links across the internet, more than half spent fewer than 15 seconds actively on the linked page); Caitlin Dewey, *6 in 10 of you will share this link without reading it, a new, depressing study says*, WASH. POST (June 16, 2016), *available at* https://www.washingtonpost.com/news/the-intersect/wp/2016/06/16/six-in-10-of-you-will-share-this-link-without-reading-it-according-to-a-new-and-depressing-study/ (last visited June 13, 2023) (documenting the phenomenon whereby internet users share and publicly comment on material they have not even read); Rita Kind-Envy, *People Don't Read Online—They Scan. This Is How to Write for Them*, UX PLANET (Oct. 12, 2022), *available at* https://uxplanet.org/people-dont-read-online-they-scan-this-is-how-to-write-for-them-80a75069c14e (last visited June 13, 2023) (describing study finding that almost 80% of readers merely scan webpages they come across, rather than reading them).

[5] *See, e.g.*, Chris Cillizza, *Americans read headlines. And not much else.*, WASH. POST. (Mar. 19, 2014), *available at* https://www.washingtonpost.com/news/the-fix/wp/2014/03/19/americans-read-headlines-and-not-much-else/ (last visited June 20, 2023); *see also How Americans get their news*, AM. PRESS INST. (Mar. 17, 2014), *available at* https://www.americanpressinstitute.org/publications/reports/survey-research/how-americans-get-news/ (last visited June 21, 2023) (reporting that just "4 in 10 Americans report that they delved deeper into a particular news subject beyond the headlines last week").

14

tangible, documented support for that conclusion favors granting this motion.

### C. Neither A360 Nor the General Public Will Suffer Any Harm if Doe Is Permitted to Proceed Pseudonymously.

Finally, no one will suffer any prejudice or harm from granting Doe's motion—still another fact that cuts in favor of granting Doe's motion. *See Francis*, 631 F.3d at 1316.

A360 is already aware of Doe's identity, having received multiple communications from her as she attempted to resolve this matter without litigation. Doe Decl. ¶ 19. Because A360 knows Doe's identity, it will not be precluded from conducting a full range of discovery in building a defense for trial, meaning it will not be prejudiced if this Court grants Doe's motion. *See In re Chiquita Brands Int'l, Inc.*, 965 F.3d at 1249 n.8 ("we agree that [appellants'] anonymity does not prejudice Chiquita since it knows the pseudonymous appellants' identities").

Nor will the broader public suffer from Doe's proceeding pseudonymously. To the extent the public has an interest in the events that led to the Publications—like the relationship between Musk and Zilis or the birth of their twins—those events did not involve Doe at all. Her connection with them now is purely the product of recklessness by A360 and its agents at *Us Weekly*. And to the extent the public has an interest in the litigation itself, the interest will presumably be about A360's misconduct, not about Doe's identity. In other words, allowing Doe to proceed

15

pseudonymously in this matter "does not obstruct the public's view of the issues joined or the court's performance in resolving them"—which is yet another factor that supports granting Doe's motion. *Stegall*, 653 F.2d at 185.

## CONCLUSION

Motions for pseudonymity call for weighing "the need for openness against the genuine needs for anonymity that arise in a case like this." *Francis*, 631 F.3d at 1318. In this case, the balance is not close. On the one hand, Doe has a real, demonstrated interest in preventing any further association with the Publications and the stigmatizing narrative they advance. On the other hand, A360 has no interest in deepening the false connection its Publications created about Doe and her relationship to Musk and his twins.

For all the reasons set out above, this Court should grant Doe's motion and order that all materials filed in this action, all judgments, and any other documents relating to this action shall refer to Plaintiff as Jane Doe, without additional identifying information. A proposed order to that effect is attached to this motion. If, however, this Court decides not to permit Doe to proceed pseudonymously, Doe asks that, rather than dismissing her complaint—which could unnecessarily create issues with the applicable statute of limitations—the Court stay the litigation for 10 days to permit Doe to file an amended complaint under her real name.

Dated: July 5, 2023                                         Respectfully submitted,

                                                            */s/ G. Taylor Wilson*

Thomas A. Clare, P.C.*                                      G. Taylor Wilson
Mark Thomson*                                               Georgia Bar No. 460781
CLARE LOCKE LLP                                             WADE GRUNBERG & WILSON
10 Prince Street                                            600 Peachtree St NE, Suite 3900
Alexandria, VA 22314                                        Atlanta, GA 30308
Telephone: (202) 628-7400                                   Telephone: (404) 301-3406
Email: tom@clarelocke.com                                   Facsimile: (404) 969-4333
Email: mark@clarelocke.com                                  Email: twilson@wgwlawfirm.com

**Pro hac vice* motions forthcoming

*Attorneys for Plaintiff Jane Doe*

## **CERTIFICATE OF COMPLIANCE**

This is to certify that the foregoing document has been prepared with one of the font and point selections approved by the Court in Local Civil Rule 5.1(C). Specifically, the foregoing document was prepared using Times New Roman, 14-point font.

/s/ G. Taylor Wilson

## **CERTIFICATE OF SERVICE**

I hereby certify that on this day, I have filed the foregoing Plaintiff's Motion for Leave to Proceed Pseudonymously using the Court's CM/ECF system. I further certify that I will cause a copy of the foregoing Motion to be served on Defendant at the time service of process in this matter is accomplished.

This 5th day of July, 2023.

*/s/ G. Taylor Wilson*